UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
                              :
UNITED STATES OF AMERICA       :
                              :
          -v.-            :     S2 06 Cr. 982 (BSJ)
                              :
MICHAEL ANNUCCI,              :
     a/k/a "Mickey Annucci," and  :
FRANK PROSCIA,               :
     a/k/a "Frankie Proscia,"    :
                              :
              Defendants.   :
                              :
- - - - - - - - - - - - - - - - - -x


## GOVERNMENT'S MEMORANDUM FOR SENTENCING OF DEFENDANT FRANK PROSCIA


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the United States
      of America


LISA ZORNBERG
KATHERINE GOLDSTEIN
Assistant United States Attorneys

     - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x
                                     :
UNITED STATES OF AMERICA             :
                                     :
            -v.-                     :    S2 06 Cr. 982 (BSJ)
                                     :
MICHAEL ANNUCCI,                     :
    a/k/a "Mickey Annucci," and      :
FRANK PROSCIA,                       :
    a/k/a "Frankie Proscia,"         :
                                     :
            Defendants.              :
                                     :
- - - - - - - - - - - - - - - - - - -x

### GOVERNMENT'S MEMORANDUM FOR SENTENCING OF DEFENDANT FRANK PROSCIA

The Government respectfully submits this Memorandum in response to the sentencing submission of defendant Frank Proscia, dated April 28, 2008, and in advance of the sentencing proceeding scheduled for May 8, 2008, at 11:00 a.m.

Proscia pled guilty before this Court on October 29, 2007, to Count Two of the Indictment, which charged Proscia with aiding and abetting employee benefit plan embezzlement, in violation of Title 18, United States Code, Sections 664 and 2.

### Background

Frank Proscia was a shop steward and elected union delegate representing Local 157 when he committed the fraud at issue.  He betrayed his fiduciary duty to the union and its members, when he continued the long-running criminal scheme by L&D Installers, co-defendant Michael Annucci and others to

2

defraud the union carpenters and the union benefit funds.  As part of that scheme, L&D cheated carpenters at L&D's 11 Madison Avenue jobsite out of benefits and proper wages, and cheated the union's benefit funds of millions of dollars in contributions. Proscia did his part to advance the scheme by submitting falsified shop steward reports on a weekly basis.  Significantly, Proscia was the third in a legacy of corrupt shop stewards assigned to the 11 Madison jobsite: first Jack Hillary, then Michael Annucci, then Proscia – all three of whom were elected delegates from Local 157.

Proscia's participation in this legacy of corruption is all the more serious because Proscia knowingly flouted the court-ordered Consent Decree that has been trying to weed corruption out of the Carpenter's union for more than a decade.  Moreover, Proscia unabashedly engaged in the offense conduct during the period when the union's court-appointed Independent Investigator was openly investigating the 11 Madison jobsite.

Proscia's Sentencing Guidelines range is not in dispute: his range is 10 to 16 months.  As discussed herein, a custodial sentence within that range is both reasonable and necessary to deter similar conduct by other union shop stewards and representatives.  Proscia's request for a non-guidelines, non-custodial sentence, based on the purported existence of "mitigating" factors, is without merit.  There are no mitigating

3

factors at play here.  Proscia's claim to have cooperated with
union investigators is specious and false.  Furthermore, his
Guidelines range already credits him for having accepted
responsibility.  Accordingly, the Government respectfully submits
that a custodial sentence, within the Guidelines range, is
appropriate in this case.

**A.    The Offense Conduct**

This Court is already familiar with the nature of the
underlying scheme from having presided over the trial of co-
defendant Michael Annucci.  The Government herein briefly re-caps
some of that evidence, only insofar as necessary to provide
context for Proscia's role in the scheme.

As the evidence at trial established, L&D was a
signatory contractor with the Carpenter's union for years.  As
such, L&D – a company owned and run by Gary DiMaria, now deceased
– was obligated to hire only union carpenters, to pay carpenters
union-scale wages, and to remit benefits contributions to the
union benefit funds for each hour worked by a carpenter.  L&D's
largest and longest-running construction jobsite was at 11
Madison Avenue, in Manhattan, a campus of three buildings
occupied by Credit Suisse.  L&D was hired by Credit Suisse in
January 2000 to perform year-round carpentry maintenance and
ongoing, large-scale furniture installation projects.  The shop
steward position at 11 Madison was a coveted position, because it

4

guaranteed full-time, year round, inside work, on a long-term basis.

In 2000 and 2001, L&D's shop steward at 11 Madison was a man named Jack Hillary. However, as the trial evidence established, through the testimony of Scott Danielson, Hillary was never assigned to the jobsite from the union's out of work list ("OWL"), as he should have been in accordance with the union's job referral rules. Somehow, Hillary nevertheless managed to get the position and remain in it for two years. As the testimony of Danielson, George Volpe, and rank-and-file carpenters further established, Hillary was corrupt and helped L&D to cheat the union and its members by never submitting shop steward reports. At the time, Hillary was an elected delegate of Local 157.

After Hillary was removed as shop steward in or about May 2001 for failing to file shop steward reports, two other shop stewards (Frank Orifice and Arthur Donahue) were dispatched from the OWL to the jobsite; however, Gary DiMaria summarily fired both of them – to make room for his steward of choice, Michael Annucci. After Annucci had colluded with DiMaria and manipulated his job skills profile to perfectly match the skills L&D requested, on the third try Annucci was dispatched as shop steward to the 11 Madison jobsite. As the trial evidence established, Annucci was corrupt as well. He remained in the job

5

for nearly five years, from July 2001 until February 2006, and routinely submitted false shop stewards to the union reporting only those carpenters and hours that Gary DiMaria wanted to have reported.  As described by George Volpe, the jobsite foreman, each week DiMaria dictated which hours should be reported in the shop steward report; at DiMaria's direction, Volpe gave Annucci a list of those hours; and Annucci then prepared the shop steward report accordingly.  The evidence also established that L&D frequently paid Annucci for days and overtime hours he did not work.  During all five years of this fraud, Annucci was the executive delegate of Local 157.

In February 2006, when Annucci was promoted to the position of union organizer, Frank Proscia was the next shop steward dispatched from the OWL to fill the position.  At the time, the union's independent investigator, William Callahan, was already investigating the 11 Madison jobsite based upon hotline calls alleging corruption by Annucci.

Proscia's dispatch to the 11 Madison jobsite was suspicious for a number of reasons.  Although there are hundreds of qualified shop stewards in the union, and although shop steward appointments are made irrespective of the particular union local to which a steward belongs, Proscia was the *third* shop steward assigned to the 11 Madison jobsite who also happened to be a delegate from Local 157.  It strains credulity to think

6

that this was just coincidence, particularly given that the
steward position at the 11 Madison jobsite was a highly coveted
position.  In addition, Proscia had gotten the job through an
"immediate dispatch" – a type of dispatch that has been abused in
other instances to manipulate the job referral rules so that a
particular person gets a particular job.  Both Annucci and
Proscia were interviewed by Independent Investigator Callahan in
the Spring of 2006 about Proscia's dispatch to the job.  In his
interview, Proscia denied any manipulation or collusion, and
denied having had any advanced knowledge that the shop steward
position was coming available.  Annucci and Proscia also both
denied having had any conversations about the steward position
prior to Proscia's dispatch.

        Proscia remained the shop steward at 11 Madison Avenue
from February 9, 2006 through August 2006 – when Credit Suisse
terminated L&D's contract at 11 Madison Avenue.

        As Proscia admitted in his plea allocution, from
February 2006 to June 2006:

> On that job, I filled out my shop steward
> reports falsely in order to hide from the
> union an actual number of hours carpenters
> from L&D Installers worked on the job.  I did
> this to help L&D avoid paying money into the
> union benefit funds. . . . I did this
> intentionally and on purpose.  I knew what I
> was doing was unlawful and wrong.

(Plea Tr. at 18-19).

7

Proscia engaged in this criminal conduct in flagrant violation of his duties as a shop steward and elected union delegate. The fact that Proscia engaged in such conduct *during the pendency* of an investigation by the union's Independent Investigator makes his conduct even more serious. It indicates that Proscia was willing to advance the criminal scheme even at a time when most others would have been wary of their conduct being scrutinized. It furthermore suggests that Proscia colluded with others besides Gary DiMaria - <u>i.e.,</u> that Proscia was put into that shop steward position with the expectation that he would keep the criminal scheme going, and that he did so even in the face of the pending internal investigation. Clearly, Proscia's allegiance was not to the union or its membership.

Moreover, while defense counsel characterizes Proscia's offense conduct as "short-lived" (Def. Mem. at 3), having continued from February through June 2006, every indication is that Proscia's criminal conduct would have continued for longer *but for* the increasing intensity of the union's investigation. In June 2006, the union's investigation of L&D reached a critical point: the Independent Investigator subpoenaed L&D and obtained L&D's color-coded time sheets revealing L&D's multiple payrolls; the union confronted L&D foreman George Volpe about his role in the scheme; and the union's anti-corruption committee began summoning carpenters from 11 Madison down for interviews about

how they were paid.  The following month, in July 2006, the
Government initiated a criminal investigation of the 11 Madison
jobsite.  The scrutiny on L&D at that time caused Gary DiMaria to
start paying all carpenters correct wages and benefits – so that
Proscia's assistance in filing false shop steward reports was no
longer necessary.  Proscia, however, deserves no credit
whatsoever for ending the criminal scheme.  To the contrary,
Proscia took pains to keep it alive as long as he could.[1]

### B.    Loss Amount

In July 2006, Gary DiMaria died suddenly of heart
failure, and L&D (through its remaining principals and DiMaria's
spouse) cooperated with the union's investigation by submitting
to a forensic audit.  That audit determined that L&D had been
delinquent to the union benefit funds in the amount of
approximately $2.1 million.  L&D has since repaid that loss
amount in full.

The $2.1 million loss figure represents the total
amount of unpaid benefits at all of L&D's jobsites, not just 11
Madison Avenue.  At trial, the Government calculated the losses

---

[1]  In fact, after Proscia lost his position at 11 Madison in
August 2006, rather than put himself on the OWL, Proscia
approached Local 157 Business Manager William Hanley for help
finding his next job.  Hanley, in contravention of union rules,
secured a position for Proscia at another jobsite by pressuring a
foreman at that other jobsite to fire a rank-and-file carpenter
to make room for Proscia.  Hanley was subsequently suspended
without pay for this conduct, which was uncovered by the
Independent Investigator.

attributable just to the 11 Madison Avenue jobsite at
approximately $500,000.

In negotiating a plea agreement with Proscia, the
Government believed it was reasonable to hold Proscia responsible
only for the losses occurring during the period when he was shop
steward in 2006.  By comparing Proscia's shop steward reports
with L&D's internal time sheets for the  weeks in question, the
Government determined that Proscia omitted approximately 672.5
hours from his shop steward reports during the time-period at
issue.  The hourly benefits rate due for those hours was $30.62
per hour.  Accordingly, the total loss amount while Proscia was
shop steward at 11 Madison Avenue was $20,591.95 (672.5 hours
multiplied by $30.62 per hour).

**C.    Sentencing Guidelines Range**

**1.    Offense Level**

As the Probation Office correctly calculated, and as
the parties agree, the total  offense level is 12, as calculated
below.

1.    The base offense level is 6, pursuant to
U.S.S.G. § 2B1.1.  (PSR ¶ 40).

2.    The offense level is increased by 4, pursuant
to U.S.S.G. § 2B1.1(b)(1)(C) because the loss attributable to
Proscia was more than $10,000 but less than $30,000. (PSR ¶ 41).

3.   The offense level is increased by 2, pursuant to U.S.S.G. § 2B1.1(b)(8)(C), because it involved a violation of the March 1994 Consent Decree imposed in <u>United States v. District Council of Carpenters</u>, 90 Civ. 5722 (CSH). Specifically, the Consent Decree prohibits any union member from committing acts of "racketeering activity," as defined in 18 U.S.C. § 1961(1)(B), which includes any act indictable under 18 U.S.C. § 664.  (PSR ¶ 42).

4.   The offense level is increased by 2 levels pursuant to U.S.S.G. § 3B1.3, because the defendant abused a position of trust to facilitate the offense.  (PSR ¶ 44).

5.   The offense is reduced by 2 levels pursuant to U.S.S.G. § 3E1.1(a) because the defendant accepted responsibility.  (PSR ¶ 47).

## 2.   Criminal History

Proscia has no criminal history points.  (PSR ¶ 51). Accordingly, he is in criminal history category I.

## 3.   Guidelines Range

At offense level 12 and criminal history category I, Proscia's Guidelines range is 10 to 16 months.

11

## A CUSTODIAL SENTENCE, WITHIN THE
## GUIDELINES RANGE IS WARRANTED HERE

**A.   Applicable Law**

The now advisory Guidelines are to be considered together with the other factors set forth in 18 U.S.C. § 3553(a), by judges fashioning sentences. *See United States* v. *Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *United States* v. *Booker*, 543 U.S. 220, 261-62 (2005). In *United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005), this Court explained that a sentencing court satisfies the requirements of *Booker* when it (i) calculates the relevant Guidelines range, including any applicable departure under the Guidelines system, (ii) considers the calculated Guidelines range and the other Section 3553(a) factors, and (iii) imposes a sentence that is reasonable. "[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d at 27.

Title 18, United States Code, Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2)." That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

12

        (B) to afford adequate deterrence to criminal
        conduct;

        (C) to protect the public from further crimes
        of the defendant; and

        (D) to provide the defendant with needed
        educational or vocational training, medical
        care, or other correctional treatment in the
        most effective manner.

Section 3553(a) further directs the Court – in determining the
particular sentence to impose – to consider:  (1) the nature and
circumstances of the offense and the history and characteristics
of the defendant; (2) the statutory purposes noted above; (3) the
kinds of sentences available; (4) the kinds of sentence and the
sentencing range by the Sentencing Guidelines; (5) the Sentencing
Guidelines policy statements; (6) the need to avoid unwarranted
sentencing disparities; and (7) the need to provide restitution
to any victims of the offense.  *See* 18 U.S.C. § 3553(a).

**B.   Proscia's Sentencing Arguments and the 3553(a) Factors**

    **1.   Proscia's Specious Claim to Have Cooperated with the
        Union**

        In arguing for a non-custodial, non-guideline sentence,
Proscia contends that "he has cooperated with the union in the
investigation of others who purportedly engaged in the same or
similar conduct," and that such assistance "qualifies as 'non-5K'
cooperation."  (Def. Mem. at 11, 18-19).  That contention is
false.

First, to be clear, the Government has offered Proscia numerous opportunities to cooperate, which he has consistently declined.  At no time – either before or after being indicted – has Proscia shown any interest in assisting the Government in its investigation of union corruption.  In July 2006, one month before Michael Annucci was arrested, federal agents with the Department of Labor approached Proscia at his home, to interview him and see whether Proscia would be willing to cooperate.  Not only was Proscia unhelpful, but he also lied to the agents by denying any knowledge of carpenters being left off his shop steward reports.[2]  Subsequently, the Government explored Proscia's willingness to cooperate on other occasions – after Proscia was arrested, after he pled guilty, and just before Annucci's trial – and the response each time was a resounding "no."

The same is true of Proscia's conduct toward the union. Prior to being indicted, Proscia was interviewed by the Independent Investigator and given ample opportunity to admit to his role in the scheme and to cooperate with the union's investigation.  Proscia declined and withheld the truth about his own conduct from the union.

---

[2]  In plea discussions with defense counsel, the Government agreed not to seek an additional Guidelines enhancement for obstruction of justice, and we abide by that agreement.

14

Through discussions with union counsel and the Office of the Independent Investigator, the Government has further learned (and confirmed for purposes of this sentencing submission) that after Proscia pled guilty in this case, he reached out to the union inquiring what he could do to avoid expulsion from the union in the aftermath of his guilty plea.[3] Proscia met once with representatives of the union's anti-corruption committee and the Independent Investigator's office and was told that the best thing he could do was to admit the whole truth, from beginning to end – i.e., how he got the assignment to L&D, who told him what the scheme was and which carpenters to keep off the sheets, who else was involved, and so forth. However, Proscia provided no useful information or direct answers to these questions. He maintained, incredibly, that he was legitimately dispatched from the OWL, and that he never spoke to Annucci or anyone else about the job in advance. Proscia also refused to explain how he came to know what was expected of him in terms of falsifying his shop steward reports. Rather, he insisted that he had pleaded guilty and that was all he would do. Thus, the Government is informed that while Proscia asked the union for leniency, he did not advance the union's or the

_____

[3] Proscia and Annucci have both been charged by the union under internal disciplinary proceedings. Those proceedings were stayed until the outcome of the criminal prosecution. Proscia and Annucci both face expulsion from the union for their conduct.

Independent Investigator's investigation of this matter even one inch. Not surprisingly, therefore, Proscia's sentencing memorandum is devoid of any description of the "assistance" he purportedly gave to the union; that is because Proscia gave none. Clearly, Proscia is not entitled to any leniency in sentencing based upon his specious claim of cooperation.

### 2. Proportionate Sentences and the Need for a Sentence that Will Deter Similar Conduct

Proscia also argues for leniency on the ground that his offense conduct was less severe than that of his co-defendant, Annucci, in terms of duration and loss amount. (Def. Mem. at 2-3). While it is true that Annucci's offense conduct was more extensive, that is not a justification for imposing a non-Guidelines or non-custodial sentence on Proscia. Annucci, who is scheduled to be sentenced next month, will face a much higher Guidelines range than Proscia on account of Annucci's conviction for bribe-taking, the duration and higher loss amount attributable to Annucci's conduct, and Annucci's failure to accept responsibility. Thus, by the Government's calculations, Annucci's sentencing Guidelines range is 78 to 97 months, compared to the 10 to 16 month Guidelines range that Proscia faces. There is no reason, however, to go below the 10-16 month Guidelines range in Proscia's case just because Annucci's criminal conduct was more extensive.

16

If anything, comparison of Annucci and Proscia's conduct underscores why a custodial sentence, within the Guidelines range, should be imposed on Proscia.  Like Annucci, Proscia was not only a shop steward but also a longtime elected delegate of Local 157 when he committed his crime (a fact that defense counsel fails to acknowledge anywhere in his 44-page sentencing submission).  Like Annucci, Proscia filed false shop steward reports on a weekly basis, omitting the names of carpenters he worked side-by-side with at the jobsite, in betrayal of his duty to his fellow workers.  Like Annucci, Proscia was untruthful with the union and the Independent Investigator when questioned – violating yet another duty he owed to the union.  In short, Proscia and Annucci engaged in very similar, serious misconduct.  Moreover, as discussed above, there is no reason to believe that Proscia would have ended his misconduct but for the fact that the union's investigation put an end to the scheme.  Accordingly, Proscia should receive a sentence within his Guidelines range, just as we anticipate arguing that Annucci should receive a sentence within his Guidelines range.

Another useful comparison for sentencing purposes is the sentence recently imposed on David Veltri.  *See United States v. Veltri*, 06 Cr. 1196 (WHP).  Veltri was a Carpenter's union shop steward who was indicted in December 2006 for receiving cash

17

bribes of $8,000 from a contractor (Tri-Built Construction) in
exchange for filing false shop steward reports omitting
carpenters' hours.  Similar to Proscia, Veltri's offense conduct
spanned a five-month period, and the loss amount attributable to
Veltri's conduct was $70,000.  Veltri also accepted
responsibility and pled guilty.

On November 2, 2007, Judge Pauley sentenced Veltri to a
Guidelines sentence of 27 months' imprisonment.[4]  Furthermore,
because Tri-Built Construction, unlike L&D, had not re-paid any
of the union benefit funds' losses from the fraud, Veltri was
ordered to pay $70,000 in restitution.  Veltri, like Proscia,
urged the court to impose a non-guidelines sentence, arguing
among other things, that he was not alone in committing this type
of corruption, that it was a lapse of judgment, and that he had a
family to support.  In sentencing Veltri within the Guidelines
range, Judge Pauley stated:

> The crime that you stand convicted of is
> really a violation of your duty of loyalty as
> a shop steward.  And Bertram Russell once
> said that you cannot follow the multitude
> into evil.  Perhaps that's what you did here.
> But you have to be punished for it.

(Veltri Sent. Tr. at 9).  Judge Pauley furthermore found, in
considering the 3553(a) factors, that a Guidelines sentence was

---

[4]  Veltri was in Criminal History Category II, putting him
in a Guidelines range of 27 to 33 months.  Had Veltri had no
prior criminal history, his Guidelines range would have been 24
to 30 months' imprisonment.

appropriate because of "the need for deterrence and the need for the punishment to reflect the gravity of the crime."  (Id. at 7.)

Similarly, here, a custodial sentence within the Guidelines range is both reasonable and necessary to fulfill the sentencing goals set forth in 3553(a).  In that regard, the Government disagrees with the Probation Department's recommendation of a ten-month sentence to be served half by incarceration and half by home confinement.  (PSR at 23).  Rather, the Government respectfully submits that an entirely custodial sentence, within the Guidelines range, should be imposed.

The imposition of a custodial sentence is extremely important to reflect the seriousness of Proscia's conduct and to act as a deterrent to Proscia and others.  This prosecution is being closely watched by members of the Carpenters union, who continue to work in an industry and union beset with corruption.  Indeed, numerous blog entries can found on the Internet by rank-and-file carpenters bemoaning the continuing corruption in their union.  The fact that Proscia chose to become a part of that corruption, notwithstanding the existence of the Consent Decree and longstanding efforts to clean up the union, and notwithstanding the fact that he was *elected* to represent his fellow members, renders his conduct all the more serious.  A substantial custodial sentence in this case will serve the

important goal under the § 3553(a) factors of deterring similar
criminal violations by others, and it will send a strong message
that those who engage in union corruption will face significant
punishment.  Indeed, we believe that a sentence of substantial
imprisonment is critical to the Government's continuing efforts
to rid the Carpenter's union of corruption.

###    3.    Imposition of a Fine

Proscia opposes the imposition of any fine on the
ground that his income has been depleted in recent months and
that he may be expelled from the union.  (Def. Mem. at 9).  The
Government disagrees, and concurs with the Probation Department
that a fine of an appropriate amount should be imposed in this
case.  L&D has already re-paid the union benefit funds the full
loss amount from the fraud in which he participated – meaning
that Proscia will not be required to pay any restitution (unlike
shop steward David Veltri, who was in no better financial
position than Proscia and yet was ordered to pay $70,000 to the
union benefit funds).  Because Proscia will not be subject to a
restitution order, the imposition of a fine is appropriate.

###    4.    Other Arguments by the Defendant

Proscia also requests a non-guidelines, non-custodial
sentence on the grounds that he has expressed remorse for his
conduct, and because of his close relationship with his family.
Neither of these are grounds for the lenient relief that Proscia
seeks.  First, Proscia's modest Guidelines range of 10 to 16

months already credits him for his acceptance of responsibility. No further credit is warranted.  Second, without doubting the important role that Proscia plays in his family, there is nothing exceptional or unique about his family circumstances that would justify imposition of a non-guidelines or non-custodial sentence.

Finally, Proscia indicates that he suffers from anxiety and depression and asserts that his mental health concerns "may not be adequately addressed by the BOP's medical staff."  (Def. Mem. at 39).  That assertion is without basis.  As the Court is aware, the Bureau of Prisons is capable of treating a large range of physical and mental conditions, including anxiety and depression, which are common to an inmate population.  Attached is a letter from Dr. Gerard Bryant, the BOP's Regional Psychology Services Administrator, confirming the BOP's ability to provide Proscia with mental health assessment and treatment during any period of incarceration.

## Conclusion

For these reasons, Proscia should be sentenced to a custodial sentence within the Guidelines range of 10 to 16 months' imprisonment.

Dated:    New York, New York
          May 5, 2008

                         Respectfully submitted,

                         MICHAEL J. GARCIA
                         United States Attorney for the
                         Southern District of New York,
                         Attorney for the United States
                         of America

                   By:   _____
                         Lisa Zornberg
                         Katherine Goldstein
                         Assistant United States Attorneys
                         Tel.:  (212) 637-2720

CERTIFICATE OF SERVICE

LISA ZORNBERG deposes and says that she is employed in the Office of the United States Attorney for the Southern District of New York.

That on May 5, 2008, she served a copy of the attached Government's Motion for Sentencing of Defendant Frank Proscia by ECF and e-mail, on:

>       Charles Ross
>       Christopher Padurano
>       111 Broadway, Suite 1401
>       New York, NY 10006

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. Section 1746.


Dated:    New York, New York
          May 5, 2008

                              _____
                              LISA ZORNBERG

23

# EXHIBIT A

05/02/2008  12:51    17188405084              ASIAMEL CRUZ                    PAGE  02/03



**U.S. Department of Justice**

Federal Bureau of Prisons

*Northeast Regional Office*

U.S. Custom House
2nd & Chestnut Streets - 7th Floor
Philadelphia, PA. 19106

April 30, 2008

Lisa Zornberg, Esquire
Assistant U.S. Attorney
U.S. Attorney's Office for the
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

    Re:  United States v. Frank Proscia

Dear Ms. Zornberg:

    Thank you for your recent inquiry concerning the Federal Bureau of Prisons (BOP) ability to provide adequate health care for federal prisoners with significant, acute or chronic medical or mental health conditions.  Specifically, you have asked whether, based on the available information, the BOP can provide the necessary and appropriate care for Mr. Proscia should he be incarcerated in a federal correctional facility.

    I am only aware of Mr. Proscia's mental health condition as described in defendant's sentencing memorandum.  A review of the memorandum indicates that Mr. Proscia is not suffering from any major mental illness, but has depression and anxiety.  He has also been diagnosed with Adjustment Disorder with Anxious and Depressed Mood and Personality Disorder.  Mr. Proscia is currently prescribed two medications, Lexapro and Xanax.  He has been fully compliant with treatment.

    As the Regional Psychology Services Administrator, I am aware of the capabilities and mental health services offered by federal correctional institutions.  Upon entering the Bureau, all inmates are psychologically screened, and all inmates are given access to psychological treatment if they request it.  The Bureau of Prisons has over 400 doctoral level psychologists and over 650 mental health and substance abuse treatment specialists.  In most Bureau institutions doctoral level psychologists function as front-line providers of mental health services to inmates.

Lisa Zornberg, Esquire
Assistant U.S. Attorney
April 30, 2008
Page Two

Direct inmate services include psychological assessments, crisis
intervention, long-term therapy, short-term therapy, and group
therapy.  These therapies include supportive psychotherapy for
inmates who wish to gain insight into their motivations and
actions.  All care provided is consistent with medical community
standards.

The BOP houses and treats a significant amount of inmates
with a wide variety of mental illnesses, including those inmates
that experience psychological symptoms such as depression and
anxiety during incarceration.  Along with group and individual
therapy, the Bureau's formulary contains numerous psychotropic
medications to meet the mental health needs of inmates if
necessary.  As indicated above, Mr. Proscia is currently
prescribed two psychotropic medications.  Substantially similar
equivalents of Lexapro and Xanax are available on the Bureau's
formulary.  Mr. Procia's medications will be reviewed upon
arrival at a Bureau institution, and a determination will be made
as to whether they are medically necessary.  If so, the
medications will be provided in a timely manner.

Finally, although not specifically addressed in the
sentencing memorandum, the BOP has issued extensive guidance to
all staff regarding the management of potentially suicidal
inmates.  All staff are trained in suicide recognition and
prevention.  Further information regarding Bureau's management of
potentially suicidal inmates can be found at Program Statement
5324.03, Suicide Prevention Program, www.bop.gov.

I am aware of the capabilities and mental health services
offered by the Bureau.  The Bureau has the physicians, staff,
expert community consultant staff and facilities to provide for
Mr. Procia's mental health conditions.  If I can offer any
further information in this matter, please do not hesitate to
contact me.

Sincerely,

Gerard Bryant, Ph.D.
Psychology Services Administrator
Northeast Region